GREAT AMERICAN NURSING CENTERS, INC., and Consolidated Subsidiaries,

v.

John H. NORBERG, Tax Administrator.

No. 79–103–M.P.

Supreme Court of Rhode Island.

Dec. 24, 1981.

Higgins, Cavanagh & Cooney, Guido R. Salvadore, Albert R. Romano, Providence, for petitioners.

Dennis J. Roberts, II, Atty. Gen., Perry Shatkin, Chief Legal Officer (Taxation), Providence, for respondent.

OPINION

MURRAY, Justice.

This is a petition for certiorari to review a District Court judgment dismissing the appeal of the plaintiffs, Great American Nursing Centers, Inc., and Consolidated Subsidiaries[1] (taxpayers), as having been untimely filed.

The facts are undisputed. The taxpayers filed a consolidated tax return for the year 1976. The defendant tax administrator, disagreeing with the method used in computing the return, determined the amount

---

1. According to the petition filed in the District Court, the Consolidated Subsidiaries are:

Kent Nursing Homes, Inc., Commonwealth Ave., Warwick, R.I.
Grandview Nursing Home, Inc., Chambers St., Cumberland, R.I
Skyview Convalescent Hospital, Inc., Marc Drive, Wallingford, Conn.
Grand Islander Health Care Centers, Inc., Green End Ave., Middletown, R.I.
Gano Associates, Inc., 150 Lavan Street, Warwick, R.I.

P. T. Associates, Inc., 150 Lavan Street, Warwick, R.I.
MKY Realty, Inc., 150 Lavan Street, Warwick, R.I.
Kent of Newport, Inc., 150 Lavan Street, Warwick, R.I.
First Equity Capital Corporation, 150 Lavan Street, Warwick, R.I.
Great American Management, 150 Lavan Street, Warwick, R.I.
General Maintenance, 150 Lavan Street, Warwick, R.I.

due and owing the State of Rhode Island through the use of a method employed by the agency for a number of years. The taxpayers duly appealed within the Division of Taxation.

After considering the arguments raised and an agreed statement of facts submitted by the parties, the tax administrator notified taxpayers of his final decision on October 20, 1978; it required the payment of an additional $6,736.75. On November 16, 1978, taxpayers paid the balance due under protest. Approximately three months after making the payment, on February 13, 1979, taxpayers, acting pursuant to the terms of G.L.1956, § 44–11–35, as amended by P.L. 1976, ch. 140, § 21,[2] petitioned the District Court for a determination of their proper tax liability.

Promptly thereafter, the tax administrator made a motion to dismiss the District Court appeal. The taxpayers objected and a hearing was scheduled.

At the hearing of February 27, 1979, the tax administrator argued that G.L. 1956 (1977 Reenactment) § 42–35–15,[3] the Administrative Procedures Act, provided the exclusive remedy for those aggrieved by a final decision of his office. The tax administrator further contended that since taxpayers did not file their appeal within thirty days of the mailing of the agency's final decision as required by § 42–35–15(b), the appeal should be dismissed.

In opposition to the motion to dismiss, taxpayers presented a number of arguments to support their position that § 44–11–35 provided a remedy in addition to the one provided in the Administrative Procedures Act § 42–35–15. They contended that since § 44–11–35 provides a four-month appeal period, a requirement the tax administrator admitted they had complied with, the motion should be denied and their action be allowed to proceed to the merits.

After hearing the arguments of counsel, the District Court judge granted the motion

---

**2.** General Laws 1956, § 44–11–35, as amended by P.L.1976, ch. 140, § 21, in pertinent part provides:

"Judicial review—order of refund.—Any taxpayer which is aggrieved by the determination by the tax administrator of the tax due and payable by it under the terms of this chapter may at any time after such determination and within four (4) months after such tax is payable, provided said tax has been paid, petition the sixth division of the district court setting forth the reasons why such determination is alleged to be erroneous and praying relief therefrom. Any taxpayer aggrieved by the failure of the tax administrator to allow and pay a claim for refund of any tax paid under this chapter within four (4) months after the same has been filed, may, within four (4) months from the expiration of such four (4) months' period, petition the sixth division of the district court setting forth the reasons why such claim for refund should be allowed and praying that it be allowed. Upon the filing of any such petition the clerk of such court shall thereupon issue a citation, substantially in the form provided in § 44–5–26, to summon the tax administrator to answer said petition and the court shall proceed to hear said petition and to determine the correct amount of the tax and the amount of any refund which may be due the taxpayer. * * * A party aggrieved by a final order of the court may seek review thereof in the supreme court by writ of certiorari in accordance with the procedures contained in

§ 42–35–16 of the general laws of 1956 (1969 reenactment)."

**3.** General Laws 1956 (1977 Reenactment) § 42–35–15, as amended by P.L.1976, ch. 140, § 20, in pertinent part provides:

"Judicial review of contested cases.—(a) Any person who has exhausted all administrative remedies available to him within the agency, and who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter. This section does not limit utilization of or the scope of judicial review available under other means of review, redress, relief, or trial de novo provided by law. Any preliminary, procedural, or intermediate agency act or ruling is immediately reviewable in any case in which review of the final agency decision would not provide an adequate remedy.

"(b) Proceedings for review are instituted by filing a complaint in the superior court of Providence county, or where expressly provided by the general laws in the sixth division of the district court, within thirty (30) days after mailing notice of the final decision of the agency or, if a rehearing is requested, within thirty (30) days after the decision thereon, provided, however, that any person who is aggrieved by a final decision concerning the assessment or determination of any tax, interest or penalty made by the tax administrator must pay the amount of such tax, interest or penalty to said administrator as a prerequisite to the filing of such complaint."

to dismiss, relying upon his previously held belief that the thirty-day appeal period of the Administrative Procedures Act was intended to control. He found that although the Walsh Act[4] may have republished the four-month limitation period of § 44–11–35, this republication was not intended to serve as an amendment.

The taxpayers argue that the District Court judge committed error when he dismissed their appeal for failure to file within thirty days as required by § 42–35–15, because they filed within the four-month requirement of § 44–11–35. They point to a number of arguments to support their position that § 44–11–35 and § 42–35–15 are not irreconcilably repugnant and were intended to provide cumulative remedies for aggrieved taxpayers in general. Most significantly, they argue that the republication of the words "within four months" in the 1976 amendment was not a meaningless act of a Legislature that is presumed to know the state of the existing law, but rather a clear sign of the legislative intendment to provide an additional remedy in this situation. Also, they contend that § 44–11–35 is a more specific statute than § 42–35–15 and therefore, under their view of the basic rules of statutory construction, "tantamount" to § 42–35–15; it is their position that this manifests a clear intention on the part of the Legislature to provide cumulative remedies. As additional evidence of their view of legislative intent in this area, taxpayers cite a number of tax statutes enacted subsequent to the Administrative Procedures Act which provide differing time periods for seeking judicial review.[5] According to taxpayers, these subsequent enactments disclose the motive for the Legislature's desire to provide cumulative remedies in this area: The Legislature wanted to allow certain taxpayers longer periods of time to raise the money necessary to pay the disputed taxes prior to seeking judicial review.[6]

For reasons that will soon become apparent, we reject these arguments.

The Administrative Procedures Act became effective in 1964; it implicitly repealed the inconsistent provisions of § 44–11–35 which was first enacted in 1947. This court has consistently stated that the act was intended to provide an exclusive method of judicial review of agency decisions unless the agency is one of those specifically exempted by the provisions of § 42–35–18. *Herald Press, Inc. v. Norberg*, R.I., 405 A.2d 1171 (1979); *Colonial Hilton Inns of New England, Inc. v. Rego*, 109 R.I. 259, 284 A.2d 69 (1971). The Division of Taxation is not one of those exempted. *Sterling Shoe Co. v. Langton*, 103 R.I. 688, 693, 240 A.2d 727, 730 (1968).

In *Sterling Shoe Co. v. Langton, supra,* we upheld a trial-court judge's decision to remand the case to the tax administrator for hearings in accordance with the Administrative Procedures Act. In that case we held that the act had supplanted certain administrative remedies provided in § 44–10–11 and § 44–19–17. Also, in the area of unemployment compensation, we have held that § 42–35–15(a) implicitly repealed cer-

---

4. Passed in 1976, the so-called Walsh Act transferred the jurisdiction of a number of non-jury matters from the Superior Court to the District Court. Public Laws 1976, chapter 140. When the transfer took place the four-month limitation period of § 44–11–35 remained.

5. The four tax statutes cited by taxpayers are:

    1. General Laws § 44–28–30, as enacted by P.L.1969, ch. 197, art. I, § 1 (Investment Tax—ninety-day period) (Repealed by P.L.1971, ch. 8, art. 3, § 1).

    2. General Laws § 44–29–12, as enacted by P.L.1969, ch. 197, art. 2, § 1 (Admissions to Racing Events—fifteen-day period).

    3. General Laws § 44–30–90, as enacted by P.L.1971, ch. 8, art. I, § 1 (Personal Income Tax—ninety-day period).

    4. General Laws § 44–33–15, as enacted by P.L.1977, ch. 237, § 1 (Property Tax Relief—thirty-day period).

6. In analyzing the four statutes cited by taxpayers, it is interesting to note that the statute taxing admissions to racing events has the shortest time period for seeking judicial review. If we were to accept taxpayers' reasoning, we would be compelled to conclude that the Legislature obviously felt that race-track patrons could more readily obtain the needed funds to contest the tax. Quite possibly this is due to a greater familiarity with "creative financing."

tain standing requirements for those contesting decisions of the Board of Review of the Department of Employment Security. *New England Telephone and Telegraph Co. v. Fascio*, 105 R.I. 711, 254 A.2d 758 (1969).

Specific in the Administrative Procedures Act itself is the mandate that when the act took effect upon January 1, 1964, "all acts and parts of acts inconsistent herewith shall stand repealed." Section 42–35–18. This requirement was consistent with the purpose behind the act: a need existed for "a uniform and consistent approach to the problems created by the increasing number and expanding jurisdictions of state administrative agencies." *New England Telephone and Telegraph Co. v. Fascio*, 105 R.I. at 715, 254 A.2d at 761.

Therefore, when the act became effective in 1964, its thirty-day limitation period obviously supplanted the four-month limitation period of § 44–11–35.

The more difficult problem is to ascertain whether the enactment of the Walsh Act in 1976 somehow serves to evidence a legislative intent to revive the four-month limitation period of § 44–11–35. As has been previously mentioned, when the Walsh Act was written, it retained the "within four month" language of § 44–11–35. In his brief and at oral argument,[7] counsel for taxpayers argued that the republication of the language showed a clear legislative intent to continue the remedy. We reject this argument.[8]

▮ In construing statutes, this court's function is to ascertain the legislative intent and to effectuate that intent whenever it is within legislative competence. *Gott v. Norberg*, R.I., 417 A.2d 1352 (1980); *Vaudreuil v. Nelson Engineering and Construction Co.*, R.I., 399 A.2d 1220 (1979). When a subsequent statute conflicts with an earlier one, our role is to determine the intent of the Legislature in passing the subsequent statute. *St. Germain v. City of Pawtucket*, 119 R.I. 638, 382 A.2d 180 (1978).

When dealing with the Walsh Act, we find that the Legislature has made our duty relatively easy by attaching a section called "Explanation" to the act. Public Laws 1976, ch. 140, § 34. (See appendix.) The explanation states that "[t]his act is intended to accomplish a substantial restructuring of the jurisdiction of Rhode Island's trial courts by transferring certain non-jury proceedings from the superior court to the district court." Consistent with the stated purpose, the words "superior court for the counties of Providence and Bristol" were lined out and replaced by the words "and the sixth division of the district court" in the amended version of § 44–11–35. Nowhere in the explanation is anything mentioned concerning the extension of time limitations for the bringing of actions.

Finally, just last term, in *Rohrer v. Ford*, R.I., 425 A.2d 529 (1981), we rejected a similar republication argument involving the state's Merit System Act G.L.1956 (1969 Reenactment), chapters 3 and 4 of title 36. In *Rohrer*, counsel for an employee dismissed by the Department of Administration argued that the director of the department could not appeal a decision of the Personnel Appeals Board reinstating that employee because the Legislature had restated a total of four times in amending G.L.1956 (1969 Reenactment) § 36–4–42 that the decisions of the board shall be "final and binding upon all parties * * *." The trial-court judge had found this argument persuasive; in reversing, we did not. *Id.*, 425 A.2d at 530–31. We concluded that "this repetition is attributable solely to the

---

**7.** In addition, counsel for taxpayers strenuously asserted arguments concerning prejudice to his clients and construing statutes against the drafter. These arguments are not persuasive in light of the fact that in the appendix to his brief he included a letter from the tax administrator's office advising his client that the taxes due must be paid before "judicial review is filed *within 30 days* in the Sixth Division District Court." (Emphasis added.) In fact, the tax was paid within thirty days of the final decision of the tax administrator.

**8.** We also reject, for the same forthcoming reasons, taxpayers' argument that the subsequently enacted taxing statutes evidence a legislative intent to retain the four-month limitation period.

difference in draftspersons because at no time has the General Assembly ever indicated an intent to exempt the board from the operation of the APA." *Id.*, 425 A.2d at 531. Likewise, in the present case, there is no indication of a legislative intention to revive the four-month limitation period of § 44–11–35.

■ In conclusion, we hold that the failure of the taxpayers to comply with the Administrative Procedures Act provision requiring appeals to be brought within thirty days of the tax administrator's decision precluded relief in the District Court. Therefore, the District Court judge's decision to dismiss the appeal was correct.

The petition for certiorari is denied and dismissed, the writ heretofore issued, is hereby quashed, the judgment entered in the District Court is affirmed, and the papers certified to this court are ordered returned to the District Court with our decision endorsed thereon.

### APPENDIX

*Explanation*, P.L. 1976, ch. 140.

"This act is intended to accomplish a substantial restructuring of the jurisdiction of Rhode Island's trial courts by transferring certain non-jury proceedings from the superior court to the district court. At the present time, it is generally acknowledged that one of the most urgent needs of the state's justice system is speedier disposition of jury trials, both criminal and civil. This is particularly crucial on the criminal side where delay between apprehension and trial is believed by many experts to contribute significantly to increased crime rates by impairing the deterrent factor of speedy punishment. Although delay in bringing cases to trial in the Rhode Island superior court is not as severe as in some jurisdictions, it does exist and, in the view of many, can be reduced in meaningful fashion through more efficient utilization of existing judicial manpower and facilities.

"In considering ways to accomplish this objective, the commission to study criminal procedures surveyed the workloads and ca-

pabilities of the state's trial courts. It concluded that at the present time the superior court is overburdened while the district court is not being utilized to its fullest capacity. Thus, the commission turned its attention to a proposal to reallocate the jurisdiction of these courts by shifting part of the caseload of the superior court to the district court, thereby making available additional time of superior court judges for jury trials—particularly felony cases. The commission's survey, however, revealed two major limitations on the types of matters that could be shifted to the district court. First the district court historically has not kept verbatim records of its proceedings. Second, it sits without juries and presently lacks the necessary physical facilities to conduct jury trials. Principally as a result of these factors, all of the district court's final judgments are subject to trial de novo in the superior court, thereby creating duplication of effort. The commission concluded that unless these impediments could be overcome, there would be little in the way of meaningful reallocation of jurisdiction that could be accomplished. The commission surveyed various proposals and concluded that, without a substantial expenditure for the renovation or construction of facilities, it is not feasible to provide the district court with the capacity to conduct jury trials. It found, however, that for a relatively modest expenditure the district court could be made a court of record by the installation of electronic recording machines in each division of the district court. The installation of these devices would make it unnecessary to provide trials de novo in the superior court of non-jury matters tried in the district court since a full record of the proceedings would then be available for ordinary appellate review.

"Proceeding on the assumption that sufficient funds would be appropriated and that adequate electronic recording devices would be installed in the district court, thereby making it a court of record, the commission surveyed the superior court's non-jury jurisdiction to determine which types of proceedings account for a sufficient portion of

that court's workload to make transfer to the district court worthwhile and suitable. After consulting with the presiding justice of the superior court, the chief judge of the district court and the court administrator, and after lengthy deliberation, the commission concluded that it would be appropriate and feasible to transfer to the original jurisdiction of the district court the following non-jury proceedings: involuntary civil commitment under the mental health, drug abuse and alcoholism laws; review of decisions of the registrar of motor vehicles and the traffic violation hearing board; review of decisions by the tax administrator, the liquor control board, and the employment security board. In addition, it was deemed appropriate to transfer to the district court jurisdiction to enforce subpoenas issued by these agencies or officials and to entertain proceedings to compel compliance with the regulatory schemes administered by them. Based upon the superior court's workload of the past few years, it is estimated that the transfer of these proceedings to the district court will relieve the superior court of approximately 95% of the total appeals and other proceedings arising out of all civil commitment and regulatory legislation presently within that court's jurisdiction and will release a significant amount of judicial time for the trial of criminal and civil cases.

"Under this act, civil commitment proceedings or proceedings involving these agencies or officials are to be brought in the sixth division of the district court. Since all proceedings will be recorded, it will no longer be necessary to retry these matters de novo in the superior court. Instead, review of a determination by the district court will be in the supreme court either by writ of certiorari pursuant to the administrative procedure act, G.L. 1956, section 42–35–16 (1969 reenactment), or by appeal in cases involving adjudications of contempt or where expressly provided in a particular act, as for example under the mental health act, G.L. 1956, section 40.1–5–8(11) (1969 reenactment). In essence, in all of the areas affected by this act, pro-

ceedings in the superior court have been eliminated entirely and proceedings in the district court replace them.

"In addition to freeing up time for the superior court, this proposal is expected to have a number of collateral benefits. First, the installation of electronic recording machines will mean that a full record will exist of various initial proceedings that occur in the district court in felony cases—for example, bail hearings and preliminary examinations. This will eliminate the need for transferring to the superior court bail hearings in cases involving serious felonies (see rule 5, dist. R. crim. P.) and also make available to both sides a complete, accurate record of any testimony taken in the district court. Moreover, the installation of recording devices will open the possibility of ultimately modifying the existing system of trial de novo in the superior court in cases within the district court's original jurisdiction for which trial by jury is not required.

"Finally, the commission to study criminal procedures views this act as an interim step in the direction of fuller integration and more efficient use of the state's existing judicial resources. It is anticipated that enhancing the responsibility and prestige of the district court while reducing some of the heavy burdens of the superior court will lead to further proposals for better utilization of the courts and thereby produce a more effective system of justice.

"The act would take effect on October 1, 1976. All proceedings which were commenced in the superior court prior to October 1, 1976, shall remain in that court until disposed of finally."